UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>ALPINE LAND & RESERVOIR<br>COMPANY, *et al.*,<br>Defendants. | Case No.: 3:73-cv-00183-MMD<br><br>ORDER |

## I.   SUMMARY

This matter arises from a dispute over the alleged failure of Deputy Water Masters Steve Wilcox and David Wathen (collectively, "the Water Master") to properly administer and deliver water under the Carson River Decree. In particular, Tobin A. George and Margaret M. George (the "Georges"), trustees of the George Family Trust (the "Trust"), moved to disqualify these two Deputy Water Masters based on a claim of bias.[1] (ECF No. 3384 ("Motion").) As further explained below, the Court will deny the Motion.

## II.   RELEVANT BACKGROUND

The following facts are adapted from the Motion and supporting exhibits. The George Family Trust owns a 40-acre parcel in Douglas County, Nevada, commonly known as "860 Eagle Meadows Lane." (ECF No. 3384 at 4.) The parcel is part of a former ranch holding once owned by Flying Eagle Ranch, LLC ("Flying Eagle Ranch"). (*Id.*) The property is associated with water rights governed by the Carson River Decree (ECF No. 519-5), which adjudicates rights to use water from the Carson River system and its tributaries. (ECF No. 3384 at 2, 4, 11; ECF No. 3384-1 at 12.) In 2001, those rights were modified through a change application, resulting in the issuance of Permit 67473 (the

---

[1]The Water Master responded (ECF No. 3389), and the Trust replied (ECF No. 3392). The Court held a hearing on the Motion on May 5, 2026. (ECF No. 3421 (the "Hearing").)

"Permit"), which was later perfected under Certificate 19539 in 2014. (ECF No. 3384 at 4; ECF No. 3384-1 at 17, 22-23.) In December 2017, the Nevada State Engineer confirmed title to the Trust for 37.82 acres of water rights under this Permit. (ECF No. 3384 at 4-5; ECF No. 3384-1 at 26.) An upstream neighboring parcel, formerly part of the Flying Eagle Ranch, owned by David and Valerie Winkler is subject to the same Permit and holds approximately 20 acres of associated water rights, as confirmed by the Nevada State Engineer. (ECF No. 3384 at 5; ECF No. 3384-1 at 20.)

### A.    The State Court Action: Easement Litigation

As noted, the Trust's parcel and the Winklers' parcel were originally part of a single larger property that was later subdivided. (ECF No. 3384-1 at 28.) According to the Motion, express easements for certain irrigation conveyance ditches were "mistakenly omitted" during that subdivision, although water continued to flow through existing ditches servicing various parcels, namely the Trust's. (ECF No. 3384 at 5.) The Georges allege that, over time, however, the Winklers "systematically began filling in" or obstructing these ditches, preventing water from reaching the Trust's downstream property.[2] (*Id.*) In 2019, the Georges filed a complaint against the Winklers in the Ninth Judicial District Court of the State of Nevada (Case No. 19-CV-0264) (the "State Court Action") (ECF No. 3384-1 at 28) to restore access to the Trust's water. (*Id.*)

On August 8, 2022, the state court ordered that an implied easement be granted across the Winklers' property to allow water delivery to the Georges and directed the parties to cooperate with the Water Master to develop a rotation schedule to ensure property delivery.[3] (*Id.* at 6; ECF No. 3384-1 at 28-30.) During those proceedings, Deputy

---

[2]The ditch at issue here is referred to as the "Winkler Ditch" (aka the "George Ditch" or the "South to North Ditch"). (ECF No. 3384 at 7.)

[3]The state court ordered the following: "The parties are ordered to provide the rotation schedule to, and cooperate with, the federal deputy water master who manages imposition of rotation schedules in the local area. Imposition of the rotation schedule shall run with the land and be binding upon all successive owners of the land at issue herein." (ECF No. 3384-1 at 30.)

2

Water Master Wilcox testified as a witness subpoenaed by the Winklers[4]—indicating, generally, that, under the irrigation framework he described, every 12 to 14 hours of irrigation provided to the Winkler property would correspond to 24 hours of irrigation for the Georges—and Deputy Water Master Wathen was identified as a potential witness but did not testify.[5] (ECF No. 3384 at 3, 6; ECF No. 3384-1 at 44-45, 48.) The state court subsequently adopted the following rotation schedule in accordance with Plaintiff-Georges' "proposal proffered during closing argument": "for every 12-14 hours of water received by Defendants, Plaintiff is to then receive 24 hours of water."[6] (ECF No. 3384-1 at 30.) As the state court explained, this schedule is "based upon the permitted acreage"—or the respective water rights—allocated to each party. (*Id.*)

### B.    Rotation Schedules, Water Delivery, and Allegations of Bias

Despite the state court's order, the parties have failed to successfully implement a rotation schedule. (ECF No. 3384 at 7, 10.) In its Motion, the Trust contends that the Water Master is to blame, stating that the "Water Master continues to delay full resumption of the delivery of decreed water to the George Family Trust . . ." (*Id.* at 3.) The Trust alleges that the Water Master has delayed or impeded this process, in part, by imposing allegedly nonstandard requirements, such as a "wetted area" test as applied to the Trust's parcel only, and by failing to provide clear standards or maintain consistent communication. (*Id.* at 8-9.) The Trust further asserts that the Water Master has dodged

---

[4]The Georges contend Wilcox testified "on behalf of the Winklers." (ECF No. 3384 at 13.) The Water Master responded that Wilcox testified under "a trial subpoena." (ECF No. 3389 at 2.)  Thus, the records do not support the suggestion that Wilcox voluntarily participated in the State Court Action on behalf of the Winklers.

[5]The Court notes that Wilcox's testimony was presented in hypothetical terms rather than as a conclusive recommendation. When counsel for the Georges asked Wilcox about the "rotation schedule" on the two parcels, Wilcox responded that, "They don't have a rotation schedule." (ECF No. 3384-1 at 45.)

[6]"This ratio equates to the Trust receiving approximately two hours of water for every one hour of water to the Winklers." (ECF No. 3384-1 at 124.) The state court conditioned the rotation schedule on the following regarding availability and/or priority of water, "so long as there is enough water at the time based upon the parties junior water rights as determined by a federal deputy water master." (*Id.* at 30.)

its "repeated requests" to determine "existing rotation schedule[s]" and that no schedule has been "agreed to" or "implemented." (*Id.* at 9-10.)

The Trust attributes the allegedly impeded delivery of water to various stages of "bias" arising from (1) Deputy Water Master Wilcox's participation as a witness in the State Court Action (*id.* at 3); (2) the Water Master's alleged insertion in the easement matter prior to the State Court Action (*id.* at 7); and (3) the failure to deliver water (*id.* at 8, 25). Based on these allegations, the Trust seeks to disqualify Deputy Water Masters Wathen and Wilcox, asserting they are no longer "neutral" administrators as required by the Carson River Decree. (*Id.* at 3.) Beyond mere disqualification, the Trust seeks broader relief in the form of "proper delivery of its vested [water] rights." (*Id.* at 2.)

## III.  DISCUSSION

### A.    Dispute Resolution Procedure: The "Administrative Exhaustion" Requirement Under the Carson River Decree

As an initial matter, before addressing the alleged grounds for disqualification, the Court must first resolve a threshold procedural issue. To the extent the Trust's allegations and requested relief concern the administration, delivery, or distribution of water, the Court finds that such disputes are governed by the procedures set forth in the Carson River Decree, which establishes a framework for review of "actions" or "orders" of the Water Master. (ECF No. 519-5 at 5.) In particular, the Decree requires parties to "administratively exhaust" such disputes with the Water Master as a "jurisdictional prerequisite" to seeking judicial relief. (*Id.*) As a result, the Court finds a "motion to disqualify" to be an improper vehicle for resolving what appears to lie at the heart of this dispute: the delivery and distribution of water.

Under the Decree's administrative exhaustion framework, "[a]ny person feeling aggrieved by any action or order of the Water Master may, in writing and under oath, complain to the Court, *after* service of a copy of the complaint on the Water Master. The Court shall promptly review the action or order and make such order as the circumstances warrant." (*Id.*) (emphasis added). The Decree further contemplates the nature of the

disputes governed by this process, providing that "[a]ll disputes on the Carson River system involving the existence or ownership of water rights, the distribution of water, or the transportation or measurement of water shall first be submitted to the Water Master for determination as a jurisdictional prerequisite to any complaint to the court for relief." (*Id.*)

The relief sought by the Trust falls substantially within this framework. In the opening paragraph of its Motion, the Trust states that it "seeks relief from this Court . . . to ensure proper delivery of its vested rights." (ECF No. 3384 at 2.) The Trust further alleges that the "Water Master continues to delay full resumption of the *delivery* of decreed water to the [Trust]," that the "Water Master has developed creative ways to reduce the *delivery* of water," and that the Water Master "should be disqualified from their role . . . in relation to the *delivery* of water under Permit 67473." (*Id.* at 3, 8, 25) (emphasis added). This dispute also arises from the Trust's earlier efforts "to restore its delivery ditches" in the underlying State Court Action. (*Id.* at 22.) The Trust further points to Wathen and Wilcox's "refus[al] to establish a rotation schedule consistent with the decreed rights" and the state court's order as one of the primary ways in which delivery has allegedly been obstructed. (*Id.* at 3, 6-7.) Thus, to the extent the Trust challenges the administration or delivery of water, the Court finds that such claims must first be pursued through the Decree's prescribed administrative process rather than through a motion to disqualify.[7]

Accordingly, as to the parties' dispute regarding water delivery and implementation of the rotation schedule, the Court orders the following: (1) the Trust must engage in good-faith efforts to informally resolve the dispute with the Water Master; (2) if the dispute remains unresolved after sixty (60) days, the Trust may file a formal complaint consistent with the procedures set forth in the Decree; (3) the Water Master must file an answer

---

[7]The parties confirmed at the Hearing that this dispute resolution process, as contemplated by the Decree, has yet to be instigated. (ECF No. 3421.) Moreover, counsel for the Water Master also acknowledged that no "internal" formalized process has been adopted to address the concerns of water rights holders.

within thirty (30) days of service of said complaint; and (4) the Court will issue a separate order setting an evidentiary hearing to resolve the Trust's complaint.

The Court will therefore, in the remainder of its discussion, address the Motion only insofar as the Trust separately alleges actual bias or partiality warranting disqualification of the two Deputy Water Masters.

### B.    Wilcox's Witness Testimony in the State Court Action

The Trust argues that Deputy Water Master Wilcox is biased because he testified as a witness in the State Court Action. (ECF No. 3384 at 2.) The Trust contends that Wilcox's participation as a witness on behalf of the Winklers has compromised his neutrality in administering water delivery under the Decree. (*Id.* at 3.) The Water Master counters that Wilcox's testimony does not warrant disqualification because Wilcox was subpoenaed to testify in the state court proceeding. (ECF No. 3389 at 15-16.) For this reason and for the additional reasons below, the Court agrees.

The Court finds that disqualification on this ground is unwarranted because Wilcox testified pursuant to a valid subpoena, and, moreover, the Georges did not object to his testimony at that time. (ECF No. 3384-1 at 44-48.) In fact, the Georges elicited testimony from Wilcox on cross-examination in the State Court Action and then relied on portions of that testimony to support their own proposed rotation schedule.[8] (*Id.*) The state court, in turn, ultimately adopted a rotation schedule consistent with the Georges' proposal. (ECF No. 3384-1 at 30.) The Court finds it particularly significant that the Georges not only accepted but also relied upon Wilcox's testimony and that the adopted rotation schedule, as proposed by Plaintiff-Georges, substantially tracked the testimony.[9] Thus, having

---

[8]As the Water Master points out in its opposition, the Georges even cited Wilcox's testimony in their Nevada Supreme Court briefs, stating that, "The rotation schedule, as suggested by Deputy Federal Water Master Mr. Wilcox and ordered by the District Court, sets forth a reasonable and hypothetical rotation schedule based on irrigable acres." (ECF No. 3389 at 15; ECF No. 3389-29 at 16.)

[9]Wilcox's testimony elicited on cross-examination stated the following: "If you were on a rotation, you could irrigate [the Winkler property] in 12 to 14 hours . . . [and the George property] [in] 24 hours." (ECF No. 3384-1 at 48.)

failed to object at the time, and having directly benefited[10] from the testimony it now challenges, the Trust cannot persuasively rely on that same testimony as a basis for disqualification in these proceedings.[11]

### C. Pre-Litigation Communications and Involvement in the Easement Dispute

The Trust next moves to disqualify Deputy Water Master Wilcox for bias because he "improperly inserted" himself in the easement dispute before the commencement of the State Court Action and "continues to insert" himself by "suggest[ing] alternative easement locations." (ECF No. 3384 at 3, 7.) In response, the Water Master contends that he "has never required the Georges to obtain additional easements or seek additional ditch rights." (ECF No. 3389 at 21.) In particular, the Water Master avers that the challenged communications were advisory in nature and offered as practical guidance and as a "recommendation."[12] (Id.) The Court is thus unpersuaded by the Trust's characterization of these communications as evidence of bias and finds that the Trust misconstrues the nature of the Water Master's administrative role under the Decree.

---

[10]The Court finds that the Trust materially benefited from the testimony in two ways: (1) the state court adopted Plaintiff-Georges' proposed rotation schedule; and (2) the state court ultimately granted the Plaintiff-Georges an implied easement.

[11]The Court recognizes that, generally, a Deputy Water Master's participation as a fact witness in disputes between competing water rights holders may create a potential conflict of interest, even if the dispute, itself, concerns property rights. At the Hearing, the Water Master's counsel confirmed that the Water Master did not move to quash the subpoena in the State Court Action. (ECF No. 3421.) The Trust's counsel indicated that she believes the general practice is the party subject to the subpoena should move to quash it. But, as the party best to determine whether Wilcox's testimony would present a conflict for them in the State Court Action, the Georges could have objected to Wilcox being called to testify, as well as to his testimony. Additionally, while the Court recognizes the Water Masters' counsel's explanation that the Water Master's staff are often consulted for their expertise, they should nonetheless remain mindful of the importance of maintaining both actual neutrality and the appearance of impartial administration when participating in proceedings involving water rights holders subject to the Decree.

[12]In his sworn declaration testimony, Deputy Water Master Wathen stated the following: "It has been explained to [the Georges] on numerous occasions that working cooperatively with their neighbors and obtaining ditch rights, or easement rights from neighboring properties would be in their best interests so they can directly irrigate their entire water righted area within their property. This advice was offered simply as a recommendation." (ECF No. 3389-3 at 5.)

7

The basis for the Trust's argument appears to be that the Water Master lacks jurisdictional authority over easements under the Decree, thereby making its communications "improper." (ECF No. 3392 at 10.) Notwithstanding this contention, the Court finds the Water Master's involvement, here, to be advisory, not mandatory or coercive. As the Water Master notes in its opposition, it never required the Trust to obtain additional easement rights as any sort of condition to receive its decreed water. (ECF No. 3389 at 21-22.) Rather, the challenged communications came as a "recommendation" to the Georges to cooperate with their neighboring landowners to "obtain easements with direct flow to their property" to, in turn, improve the physical access and distribution of their full water allocation across their property for efficiency purposes. (*Id.*) In reply, the Trust concedes to this point, acknowledging that the Water Master "never required the Trust to obtain additional easements," even if he "argue[d] ad nauseum about alternative easements." (ECF No. 3392 at 10.)

Moreover, the Court finds that such recommendations fall within the spirit of the Water Master's authority as contemplated by the Decree, which vests in the Water Master the authority to "direct" "rotations"[13] of water to promote "reasonably economical beneficial use." (ECF No. 519-5 at 3.) And, according to the Water Master's sworn declaration testimony, "similar recommendations" have been provided to "countless other water users" over time as part of routine administration, underscoring that the communications at issue here were general in nature and likely not targeted at the Trust in a manner suggesting bias, animus, or otherwise. (ECF No. 3389-3 at 5.) Thus, it is reasonable to conclude that the type of communications and guidance at issue is consistent with the Water Master's duties under the Decree to manage the practical administration of water delivery within a shared system.

---

[13]Under the Decree, "rotation" is defined as "the combining and exchanging of the use of water between ditches and among users." (ECF No. 519-5 at 3.) Stated differently, "rotation" refers to the "quantities of water to be diverted by the owners of the several ditches" that source water from the Carson River and/or its tributaries. (*Id.*)

Accordingly, the Court finds that the Water Master has not exceeded its administrative authority and that the Trust fails to show how any involvement as to the easements evinces actual bias or otherwise warrants disqualification.

**D.    Water Delivery**

Finally, the Trust argues that the Water Master's failure to deliver water in the allegedly entitled amounts demonstrates bias warranting disqualification. (ECF No. 3384 at 14-19.) As further explained below, the Court rejects this argument.

First, as already discussed, disputes concerning the administration, distribution, and delivery of water are governed by the procedures established in the Decree. (ECF No. 519-5 at 5.) Here, the Trust's allegations largely concern the Water Master's method of implementation of the rotation schedule and administered delivery under the Permit, which falls squarely within the type of disputes contemplated by the Decree's administrative review process. As iterated above, the Court finds that such claims must first be pursued through the Decree's prescribed administrative process rather than through a motion to disqualify. The Trust's appropriate recourse is thus to first file a complaint, as opposed to a claim of bias.

Second, to the extent the Trust contends that the Water Master's decisions regarding delivery present evidence of actual bias, the Court disagrees. Under the Decree, the Water Master's role necessarily includes overseeing water delivery, administering rotation schedules, and promoting "reasonably economical beneficial use" based upon system conditions and other practical considerations. (*Id.* at 3.) The mere fact that a water rights holder disagrees with those determinations does not, without more, establish actual bias.[14] In this case, the Trust offers no evidence of bias apart from its disagreement with the Water Master's decisions regarding delivery.

---

[14]The Court further cautions that, if every dissatisfied water rights holder could assert a claim of bias or seek disqualification of the Water Master because they disagreed with a delivery determination or did not obtain their desired result, then administration of the system under the Decree would be rendered impracticable.

Third, the evidence before the Court does not appear to support the Trust's contention that the Water Master reduced or withheld delivery in practice. (ECF No. 3384 at 14.) In fact, surveys conducted in 2024 and 2025 indicate that the Trust was ultimately approved to irrigate a greater acreage—and therefore receive more water—than it originally requested.

On September 27, 2023, the Water Master sent a letter to the Georges explaining that survey results "establish that only 10 acres of property can be irrigated through gravity by the Winkler ditch" "per historical practices" in the absence of any improvements allowing irrigation of the remaining 17 acres "from the East and Southeast." (ECF No. 3389 at 7; ECF No. 3389-35 at 2.) On May 2, 2024, the Georges responded that they "had made improvements on their property," enabling them to irrigate a requested "16-17 acres from the Winkler ditch easement." (ECF No. 3389 at 9; ECF No. 3389-50 at 2.) On August 8, 2024, the Georges submitted another letter representing that, according to an additional survey, 26.82 acres could be irrigated from the Winkler ditch. (ECF No. 3389 at 10; ECF No. 3389-55 at 2.) Subsequently, on April 23, 2025, Deputy Water Master Wathen informed the Georges that, based upon his inspection, approximately 30 acres could be irrigated, "as opposed to their requested 27."[15] (ECF No. 3389 at 13; ECF No. 3389-71 at 2.) As a result, the Court finds that the record reflects an ongoing administrative process in which the Water Master evaluated survey results, conducted inspections, and ultimately approved more water for delivery than the Trust itself requested. Far from demonstrating bias, this evidence undermines the Trust's contention that the Water Master improperly reduced or withheld delivery of water.

///

///

---

[15]In his letter, Deputy Water Master Wathen states: "After touring your property during this first irrigation cycle it was fairly clear to me that with the added irrigation improvements now in place, you should be able to irrigate the roughly 27+ acres on the eastern 2/3rds of the property as well as the roughly 2+ acres on the southwest and western portion of the property. This would bring your total irrigable acreage at this time to approximately 30 acres." (ECF No. 3389-71 at 2.)

## IV. CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the Motion before the Court.

It is further ordered that the Trust's motion to disqualify (ECF No. 3384) is denied.

DATED THIS 11th Day of May 2026.

_____
MIRANDA M. DU
UNITED STATES DISTRICT JUDGE